IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  98-cv-01072-RPM

MEDTRONIC NAVIGATION, INC.,
MEDTRONIC SOFAMOR DANEK , INC.,
SOFAMOR DANEK HOLDINGS, INC.,
ST. LOUIS UNIVERSITY, and
TRUSTEES OF DARTMOUTH COLLEGE,

                Plaintiffs,

v.

BRAINLAB MEDIZINISCHE COMPUTERSYSTEMS GMBH,
BRAINLAB AG,
BRAINLAB USA, INC., and
BRAINLAB, INC.,

                Defendants.

---

ORDER FOR AWARD OF ATTORNEY FEES AND COSTS TO BRAINLAB
DEFENDANTS

---

The defendants (collectively BrainLAB) seek to recover all of their attorney fees

and costs incurred in the defense of this suit for patent infringement, contending that it

was filed and prosecuted not to protect the technology protected by the patent claims

but to drive a competitor out of a market for an emerging technology for application in

the navigation of surgical instruments in procedures requiring exquisite precision, as in

the removal of a brain tumor.  Medtronic Navigation, Inc. (Medtronic) and its

predecessor Surgical Navigation Technologies, Inc. (SNT) marketed variations of a

device called "StealthStation" in competition with BrainLAB's "VectorVision" devices.

The accused devices can be described as passive optical systems in contrast to an active acoustic system. That contrasting technology was at the core of this case.

BrainLAB contends that it is entitled to fees and costs because this is an exceptional case justifying relief under 35 U.S.C. § 285; that plaintiffs' lead counsel should be held responsible under 28 U.S.C. § 1927 and that the Court should grant the motion in the exercise of its inherent authority to protect the integrity of the processes of adjudication. Upon reflection, this Court finds and concludes that the rulings on the claims construction issues adjudicated the fairly debatable issues in this case and that the manner in which plaintiffs' counsel continued the prosecution of the claims through trial was in disregard of their obligations as officers of the court. The fairness of the adversary system of adjudication depends upon the assumption that trial lawyers will temper zealous advocacy of their client's cause with an objective assessment of its merit and be candid in presenting it to the court and to opposing counsel. When that assumption has been contradicted by a trial record of conduct reflecting a winning is all that is important approach to the trial process, the court has a duty to redress this resulting harm to the opposing party.

BrainLAB has made a plausible argument that this entire civil action was frivolous. The chronology of the suit must be viewed against the backdrop of developments in the field of image-guided surgical navigation technology.

In approximately 1991, SNT began development of an image-guided surgical navigation product. SNT worked with Dr. Richard Bucholz of St. Louis University. SNT also collaborated with Dr. Peter Heilbrun of the University of Utah. In 1994, SNT

obtained rights to the application for patent that issued as U.S. Patent No. B1 5,383,454 to Bucholz (the '454 Patent or the Bucholz Patent). The claims of that patent relate to a system that depends on the activation of sound emitters on a surgical instrument and the patient which are tracked by an array of microphones establishing coordinates that give their positions through triangulation. SNT did not commercialize the active acoustic technology described in the Bucholz patent. It developed a product employing active optical technology, a system using light emitting from diodes on a surgical instrument and the patient, detected by an array of cameras to establish the positions of the instrument and the patient through triangulation. In January 1996, SNT received FDA approval and began marketing its product as StealthStation.

In May 1997, BrainLAB received FDA approval to market an image-guided surgical navigation product using passive optical technology, a system employing reflective markers on a surgical instrument and the patient and an array of cameras to establish their positions using triangulation. In late April 1998, BrainLAB's counsel wrote a letter to SNT, informing SNT that BrainLAB expected to receive a patent for passive optical navigation technology, in essence cautioning Medtronic not to incorporate that technology into its products. Twelve days later, on May 12, 1998, SNT and its parent, Sofamor Danek Group, brought this suit, complaining that the BrainLAB products using passive optical technology infringed the Bucholz '454 Patent.[1]

---

[1] The plaintiffs also sought a declaration of non-infringement of a patent owned by BrainLAB (the '861 Patent), and BrainLAB counterclaimed for infringement of that patent. After the court issued its order construing the '861 Patent, all issues relating to the '861 patent were dismissed.

Significantly, the prosecution history of the Bucholz Patent included statements by the applicant explaining that the claimed invention was distinguished by having emitters on the surgical probe as well an emitter attached to the patient's head. The prosecution history also included a narrowing amendment.

In January 1999, Medtronic acquired SNT through its acquisition of Sofamor Danek Group. Later that month, Medtronic acquired rights to three patents to Heilbrun, U.S. Patent Nos. 5,389,101; U.S. Patent No. 5,836,954, and U.S. Patent No. 5,603,318 (the Heilbrun Patents) from the University of Utah. The Heilbrun Patents describe camera-based apparatus and methods for locating a surgical instrument and patient in a medical workspace. In November 1999, Medtronic acquired a license for U.S. Patent No. 4,722,056 to Roberts (the Roberts Patent) by assignment from Elekta Company. The Roberts Patent relates to a computer-based surgical navigation system that allows a surgeon to look through the eye piece of a microscope at a target area, and see, for example, the outline of a prior image of a body part superimposed on a live image of the patient's body part.

Medtronic amended the complaint, adding claims of infringement and adding and substituting plaintiffs to encompass those having ownership interests in the relevant patent rights. By the fourth amended complaint, filed April 25, 2000, the plaintiffs included claims of infringement of the Bucholz '454 Patent, another Bucholz patent (the '183 Patent), the three Heilbrun Patents, and the Roberts patent. Sofamor Danek Holdings, a subsidiary of Sofamor Danek Group, was added as a plaintiff, along with St. Louis University (the owner and assignor of the Bucholz Patents) and the

Trustees of Dartmouth College (the owner and original assignor of the Roberts Patent). The caption was subsequently changed to reflect that Sofamor Danek, Inc. had become Medtronic Sofamor Danek and that SNT had become Medtronic Navigation, Inc. Throughout the trial, Medtronic's lawyers  portrayed SNT as the plaintiff.

Notably, Medtronic added claims of infringement of two of the Heilbrun patents on February 1, 1999, within days of acquiring those patents from the University of Utah. At trial, Dr. Kurt Smith, one of the founders of SNT, testified that the timing was merely a coincidence.  He also testified that the Heilbrun patents had been added to the complaint as an "afterthought."  Before Medtronic acquired the Heilbrun and Roberts Patents and added them to this suit, no one had ever asserted that either the VectorVision products or the StealthStation embodied any claims of those patents. Even considering Dr. Smith's entire testimony about Medtronic's reasons for acquiring the Heilbrun and Roberts Patents, the reasonable inference to be drawn is that Medtronic added these claims to bolster its position that it owned the patent rights to passive optical technology.  Medtronic and its counsel undoubtedly anticipated that the scope of the Bucholz '454 Patent would be hotly contested.  Adding other patents to the suit increased its complexity and increased the pressure on BrainLAB.

Medtronic then approached BrainLAB about a potential settlement.  BrainLAB's President, Stefan Vilsmeier, testified that those discussions centered on Medtronic's efforts to acquire BrainLAB.  There was a hiatus in court proceedings during the later half of 2001, when Medtronic and BrainLAB jointly requested several postponements of a scheduling conference, due to the ongoing settlement negotiations.

BrainLAB rejected Medtronic's buy-out overtures. In January 2002, when the settlement negotiations broke down, Medtronic changed lead counsel, and lawyers from the McDermott, Will & Emery (MWE) law firm entered their appearances. Fact and damage discovery were then reopened.

The parties briefed issues of claims construction, and a *Markman* hearing was held. Medtronic advocated broad constructions of the patents-in-suit. With respect to claim 14 of the Bucholz patent, Medtronic argued that the "reference means" should be construed as an "array of sensors," an argument that would have allowed Medtronic to proceed on a theory of literal infringement and avoid having to show that active acoustic (or active optical) and passive optical technologies are equivalent. On September 29, 2004, the Court issued its order construing the disputed claim language. That order limited the Bucholz and Roberts patents to acoustic reference systems and ruled that the Heilbrun Patent claims required a "static" workplace coordinate framework. At a scheduling conference held on February 4, 2005, Medtronic's counsel stated that it would proceed with claims of infringement under the doctrine of equivalents.

The defendants moved for summary judgment of dismissal, arguing that under the Court's construction of the asserted claims, the BrainLAB devices could not be found to infringe and that the doctrine of prosecution history estoppel precluded the application of the doctrine of equivalents as to the Bucholz Patent claims.

What was apparent to defendants' counsel and should have been equally obvious to Medtronic's principal lawyers was not perceived by the Court. The Court

elected to proceed to trial, accepting the plaintiffs' assertion that there were material factual questions to be resolved at trial, particularly with respect to issues of equivalents. At that stage in the proceedings, the Court, unlike Medtronic and its counsel, had not had an opportunity to view the accused devices. The Court's decision to proceed to trial was based on its view that the legal questions in the case could be better evaluated in the context of a full evidentiary record, rather than on information communicated through legal briefs and declarations of expert witnesses. Accordingly, the court determined it was prudent to proceed to trial, giving Medtronic a full opportunity to present its case.

At trial, Medtronic alleged infringement of claim 14 of the Bucholz '454 Patent, claim 1 of the Roberts Patent, claim 1 of the Heilbrun '101 Patent, and claim 1 of the Heilbrun '318 Patent. The Bucholz Patent, however, was the centerpiece of Medtronic's case. Of the asserted patents, the Bucholz Patent was the only one that SNT had owned during the first several years that it sold the StealthStation and the only one it owned when it filed suit. The Bucholz '454 patent provided the primary basis for Medtronic's claim that it had suffered lost profits of over $100 million.[2]

BrainLAB moved for judgment as a matter of law at the close of the evidence, but the Court submitted the case to the jury, recognizing that a defendants' verdict would end the litigation if the claims construction rulings were affirmed on appeal but

---

[2]Medtronic had paid $1.25 million for rights to all three Heilbrun Patents. Because of the ownership structure of the Heilbrun Patents, Medtronic was limited to seeking reasonable royalty damages with respect to its claims of infringement of those patents. The Roberts Patent was relevant only to the microscope feature of the accused products.

that another trial would be required if those rulings were reversed and the Court had granted the motion. The Court did not submit the issues of prosecution history estoppel to the jury, ruling that those were questions to be determined by the Court.

The jury found for the plaintiffs but the verdict was set aside by this Court's order granting the Rule 50(b) motion. Mem. Op. and Order, Feb. 24, 2006 [doc. 545]. The premises of that order were for the most part the same as those presented in the defendants' motions for summary judgment. In retrospect, those motions should have been granted, saving BrainLAB the cost of a 13-day jury trial. In setting aside the jury's verdict, this Court found that misleading trial tactics by the MWE lawyers, Mr. McMahon and Ms. Elson, had influenced the jury verdict, and their tactics were an abuse of advocacy.

After the entry of judgment in favor of BrainLAB, Medtronic appealed the judgment, and BrainLAB moved to recover its costs and attorney fees. BrainLAB's motions for costs and fees were stayed, pending the outcome of Medtronic's appeal.

The judgment in favor of BrainLAB was affirmed by the Federal Circuit Court of Appeals in March 2007, in an unpublished opinion. The Federal Circuit adopted this Court's reasoning with respect to claim construction and its reasons for rejecting the plaintiffs' evidence and theories of infringement as to all of the asserted patent claims, including the conclusion that the Bucholz Patent's prosecution history precluded Medtronic's claim of infringement of that patent under the doctrine of equivalents.

On May 3, 2007, BrainLAB followed this Court's direction at a status conference following appeal to identify the entities against which fees and costs are sought, to

provide specific evidentiary support for these claims and to make more explicit the legal theories relied on.  BrainLAB did that in its filing of May 3, 2007.  Recognizing that the responses of Medtronic and MWE would require separate representation by new counsel, the Court extended the time for those filings to July 23, 2007, and the reply to August 27, 2007.

Upon review of all of the papers filed, the Court finds and concludes that Medtronic and MWE have joint and several liability for the attorney fees and expenses BrainLAB incurred in defending this action in this court after BrainLAB's summary judgment motions showed that the claims construction rulings had eviscerated the plaintiffs' case.  Fees are awarded against the Medtronic plaintiffs (Medtronic Navigation, Inc., Medtronic Sofamor Danek, Inc., and Sofamor Danek Holdings, Inc.) pursuant to 35 U.S.C. § 285 and the court's inherent authority, and against MWE pursuant to 28 U.S.C. § 1927 and the court's inherent authority.[3]

The evidence is not sufficient to support a finding that Medtronic's contentions up to the time of the Court's ruling on the claims construction issues were frivolous, without merit or vexatiously presented.  After receiving the Court's claims construction ruling, however, Medtronic and the MWE lawyers had a duty to reexamine this litigation and make an objective assessment of the validity of Medtronic's claims that BrainLAB's products infringed the patent claims as construed.  They were obliged to accept those

---

[3]BrainLAB's supplemental memorandum in support of its motion for attorney fees and costs  [Doc. 569] states that it seeks fees against only the Medtronic plaintiffs, not St. Louis University or The Trustees of Dartmouth College, and as to the counsel who represented the plaintiff group, BrainLAB seeks fees against MWE only.

rulings as the law of the case and proceed with an appeal by requesting certification of

an interlocutory appeal or conceding the summary judgment motions. Rather than

accept that the claims construction rulings stripped the merits from this case, counsel

chose to pursue a strategy of distorting those rulings, misdirecting the jury to a different

reading of the claim language, and blatantly presenting the jury with a product to

product comparison contrary to established law and the Court's cautionary instructions.

Additionally, they deceived the jury into accepting the statements in BrainLAB's FDA

application as an admission of patent infringement. Capping all of this was a closing

argument that misdirected the jury's attention from the focus of the case, carefully

crafted to avoid the Court's instructions. That argument distorted both the evidence

and the law, misleading the jury into a plaintiffs' verdict.

      Litigation misconduct is a basis for transferring the burden of attorney fees and

expenses under both of the statutes relied on by BrainLAB and the Court's inherent

authority to supervise the conduct of litigation. In essence, the response from the

plaintiff and MWE, through new counsel, is that the Court had the obligation to stop any

trial conduct that stepped over the line of zealous advocacy. In short, they argue that

they should not be held responsible for what they were able to get away with during the

trial presentation. The adamant denial that there was any abuse of advocacy in this

case is in disregard of what this Court has already concluded and displays the same

arrogance that has colored this case almost from its inception. Throughout these

proceedings Medtronic and the MWE lawyers have demonstrated that when they are

faced with adverse court rulings, they proceed undeterred, with only superficial

observance of the court's determinations.  Such conduct supports the conclusion that after the *Markman* rulings, Medtronic's primary objective in pursuing this litigation was to put economic pressure on its competitor in the market.

*This case is exceptional under 35 U.S.C. § 285*

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed.R.Civ.P. 11, or like infractions."  *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (citations omitted).  "There is a presumption that the assertion of infringement of a duly granted patent is made in good faith. . . . Thus, the underlying improper conduct and the characterization of the case as exceptional must be established by clear and convincing evidence."  *Id.* at 1382 (citations omitted).  Those standards are met in this case.

The Court has already concluded that Medtronic engaged in litigation misconduct during the trial.  That same misconduct also supports the conclusion that Medtronic continued this suit vexatiously after the claims were construed.  Vexatious conduct includes conduct that "obfuscates the legal issues and complicates the defendants' and the court's task of sorting them out."  *Shackelford v. Courtesy Ford, Inc.*, 96 F.Supp.2d 1140, 1144 (D. Colo. 2000) (citing *Braley v. Campbell*, 832 F.2d 1504, 1509 (10th Cir. 1987)).

Medtronic and MWE point to the testimony of Medtronic's experts as evidence that its claims were not objectively baseless or brought in subjective bad faith. That argument is unavailing. The opinions of Medtronic's experts were crafted to fit the infringement theories put forward by Medtronic's counsel, and those theories were legally and factually untenable in light of the court's claim construction. Medtronic pursued a strategy of giving superficial recognition to the court's claim construction rulings, while pressing its own interpretations of the claims.

Medtronic's first witness, Dr. Smith, repeatedly described the Bucholz invention as having "an array of sensors" for detecting radiated energy – the claim construction that Medtronic had argued and lost. Medtronic then continued that same theme throughout the presentation of its expert testimony and closing arguments. Dr. Grimson, who testified as an expert on behalf of Medtronic with respect to infringement of the Bucholz and Roberts patents, described the reference means (the array of microphones) of the Bucholz patent as "sensors" for detecting radiation, and then used those terms when opining that the accused products infringed. With respect to the Heilbrun Patent claims, Medtronic contended that BrainLAB's dynamic referencing system was simply a faster version of the static system described in the Heilbrun Patents, but it supported that contention with the testimony of Dr. Taylor, whose infringement analysis failed to take into account the actual operation of the BrainLAB products. As the Court pointed out in its previous order, Medtronic's representations in its summary judgment responses with respect to the Heilbrun Patents were different from the positions it advocated at trial. Mem. and Op. on Post-

Trial Mots. at 35 & 41.  In short, after the Court issued its claim construction order and even through trial, Medtronic struggled to articulate a viable theory of infringement as to the Heilbrun patents.  It never was able to do so.

Despite its acknowledgment that product-to-product comparison would be improper for the purpose of showing infringement, Medtronic repeatedly compared the StealthStation and VectorVision products, portraying BrainLAB as a follower who had wrongfully capitalized on the success of the StealthStation.  Importantly, Medtronic did not contend that the StealthStation embodied all of the elements of the asserted patent claims.  To the contrary, in response to questions raised by the Court before trial, Medtronic argued that such a showing was unnecessary for the purpose of proving lost profits.  *See* Pls.' Mem. Addressing Damages, Sept. 2, 2005 [Doc. 421].

The most egregious example of Medtronic's improper product-to-product comparisons was its presentation of testimony and closing argument regarding a letter BrainLAB submitted to the FDA.  In seeking FDA approval, BrainLAB had referred to the StealthStation as a predicate device and stated that the VectorVision was substantially equivalent.  In his rebuttal testimony, Dr. Smith repeated the wording of BrainLAB's FDA submission, emphasizing the phrase "substantially equivalent."  Tr. at 2714:5 –13; 2723:3 –10.  During rebuttal closing argument Mr. McMahon then told the jury that "[BrainLAB] went to the FDA, and they told the FDA that our products are – the substantial equivalence here is between this product – that is, the VectorVision – is similar in design, composition, and function to the StealthStation.  *Bears directly on what we are doing here today*."  Tr. at 2976, emphasis added.  When BrainLAB's

counsel objected, the court responded that "the jury will know and be told again that the comparison is to be made to the claims and the defendant's products. This is not a comparison between the StealthStation's products and BrainLAB's products." Mr. McMahon responded, "Right, Your Honor, *this is an admission.*" *Id.* at 2977. That is, while appearing to agree with the Court's statement about the proper comparison, Mr. McMahon continued comparing the products, telling the jury that the term "substantially equivalent" in BrainLAB's FDA submission was an *admission* that BrainLAB infringed under the doctrine of equivalents.

Medtronic and MWE argue that their trial conduct was not abusive advocacy because the Court did not do enough to restrain it. That argument ignores the Court's admonitions on the issue of product-to-product comparisons (Tr. at 1578-79), as well as Medtronic's own representations to the Court. During argument about whether Medtronic should be allowed to demonstrate its StealthStation to the jury, Medtronic's counsel acknowledged that product-to-product comparisons would be improper for the purpose of showing infringement. Tr. at 917:10-12. When cross-examining Mr. Vilsmeier, Mr. McMahon (in response to objections) represented that BrainLAB's FDA letter was not going to be used for the purpose of making product-to-product comparisons. Tr. at 1925:19 – 1926:18. On this issue, the parameters had been established. Counsel were obligated to observe the court's admonitions and to comply with their own representations to the Court.

Medtronic cannot credibly claim that the product comparisons were a justified response to BrainLAB's assertion that it was the first to commercialize passive optical

technology.  Throughout the trial, Medtronic's counsel and witnesses described the

StealthStation as the product that revolutionized the field of image-guided surgery and

portrayed BrainLAB as a follower.  In presenting its defenses, BrainLAB was entitled to

explain the development of the relevant art and the place of its products in that

chronology.  BrainLAB's presentation did not "open the door" for Medtronic to tell the

jury that BrainLAB had admitted infringement in its FDA submission.  Medtronic's

counsel were experienced patent litigators who understood the differences between the

doctrine of equivalents and the FDA process.  They knew that BrainLAB's statements in

its FDA submission were not an admission that the BrainLAB products infringed the

asserted patents.  Indeed, Medtronic as a defendant has argued that admission of

similar statements it made in an FDA application would be misleading and unfairly

prejudicial.  *See Cardiovention, Inc. v. Medtronic, Inc.*, 483 F.Supp.2d 830, 840-41 (D.

Minn. 2007).

Medtronic and MWE cannot argue that product comparisons were appropriate to

show that the VectorVision and StealthStation products were substitutes for the

purpose of determining lost profits.  BrainLAB did not dispute that the StealthStation

and VectorVision products competed directly with each other.  The only conclusion to

be drawn is that Medtronic crafted and executed an intentionally misleading trial

strategy.

As set forth above, the Bucholz Patent was the centerpiece of Medtronic's case,

and in particular its damages case.  At trial, Medtronic and BrainLAB presented

evidence regarding the prosecution history of the Bucholz Patent.  During the jury

instruction conference, the Court informed counsel that the issues of prosecution history estoppel would be determined by the Court.  During closing argument, Mr. McMahon told the jury that the absence of jury instructions about the prosecution history of the Bucholz Patent showed that BrainLAB had not been forthright in its presentation.  Tr. at 2991-92.  Mr. McMahon's commentary on the lack of jury instructions was another example of the excessive partisanship that colored this trial.

The Bucholz prosecution history ultimately proved fatal to Medtronic's claim based on that patent.  MWE's attempt to blame to BrainLAB for delay in raising the issue of prosecution history estoppel is unfounded.  Prosecution history is relevant to claim construction – and in fact was argued by both Medtronic and BrainLAB during the *Markman* hearing, but prosecution history *estoppel* is a different question.  That issue came to the forefront after the Court issued its order on claim construction, rejecting Medtronic's interpretation of the Bucholz Patent claims.  From that point, the Bucholz prosecution history impacted the range of what could be considered an equivalent. Rather than alter course after the Court issued its claim construction order, Medtronic and MWE proceeded to trial, continuing to advocate Medtronic's interpretation of the Bucholz Patent and telling the jury that "this whole notion that whatever happened in the patent office on this patent, that somehow it was a limitation, is just nonsense."  Tr. at 2991:19-21.  By pointing the jury to language in the patents that supported Medtronic's reading of the claims, Mr. McMahon was directing the jury to override the court's claim construction.  Tr. at 2983-84.  He then repeatedly told the jury during

closing argument that "tracking is tracking," a statement that misguided the jury about the requirements of infringement analysis.

The procedural history of this case, particularly the numerous amendments to the complaint, indicates that Medtronic fully understood that it could not rely on the Bucholz '454 Patent to support its position that Medtronic owned the patent rights to passive optical technology, unless the Bucholz Patent claims were construed so as to bring that technology within the literal claim scope. During closing argument, Mr. McMahon told the jury that Medtronic had built its case "brick-by-brick." But Medtronic's case was built on the Bucholz Patent, and that foundation crumbled after the Court's claim construction order.

Medtronic argues that fees should not be awarded against it where its claims survived summary judgment and were presented to the jury which returned a verdict in its favor. Medtronic's argument overstates the significance of what it refers to as the "objective signposts." The Court's denial of BrainLAB's motions did not relieve Medtronic of its duty to evaluate its claims, and the Court's rulings certainly were not a license for Medtronic to engage in abusive conduct at trial. As the Court has already concluded, the jury verdict was influenced by the litigation misconduct that gives rise to the present motion.

The conduct of Medtronic and its counsel constituted much more than a few instances of overstepping during a hard-fought battle. This case involved complicated technology. Patent law is complex and not intuitive to the average juror. Parties and counsel have an obligation to refrain from seeking to take advantage of those

complexities by employing misleading strategies.  Medtronic's infringement claims had

the appearance of substance because BrainLAB's VectorVision products, like

Medtronic's StealthStation, employed concepts and some features that were also

present in the inventions of the asserted patents.  Conceptual similarity, however, is not

enough to show infringement, and a patent holder cannot pick and choose among

features found in various patents in its portfolio and then combine them to show

infringement.  Medtronic's burden was to prove that each element and limitation of each

of the asserted patent claims was found in each the accused products.  Instead,

Medtronic guided the jury to a comparison of the accused products and the

StealthStation, and then offered them a short-cut with the "tracking is tracking" sound

bite.  Medtronic's untenable positions and misleading tactics complicated the Court's

task of analyzing the legal issues.

BrainLAB has suffered an injustice, and the court has the authority under 35

U.S.C. § 285 to remedy that wrong.  BrainLAB is entitled to recover the attorneys' fees

it incurred in connection with the district court proceedings after it moved for summary

judgment.

*An assessment of fees against MWE is warranted under 28 U.S.C. § 1927:*

Any attorney or other person admitted to conduct cases in any court of the
United States or any Territory thereof who so multiplies the proceedings
in any case unreasonably and vexatiously may be required by the court to
satisfy personally the excess costs, expenses, and attorneys' fees
reasonably incurred because of such conduct.

Under this statute, "excess costs, expenses, or attorney's fees are imposable against

an attorney personally for conduct that, viewed objectively, manifests either intentional

or reckless disregard of the attorney's duties to the court." *Braley v. Campbell*, 832 F.2d at 1512.  Subjective bad faith is not a prerequisite to an award under the statute. *Id.*  "A lawyer's reckless indifference to the law may impose substantial costs on the adverse party.  Section1927 permits a court to insist that the attorney bear the costs of his own lack of care." *Id.* at 1511 (quoting *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985).  Costs and fees may be awarded under § 1927 "when an attorney is cavalier or bent on misleading the court; intentionally acts without a plausible basis; [or] when the entire course of the proceedings was unwarranted." *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1278 (10th Cir. 2005) (quoting  *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1342 (10th Cir.1998)).

 An award under § 1927 requires findings that the attorney's conduct was improper and caused an unreasonable multiplying of the proceedings.  *See Braley*, 832 F.2d at 1513 ("the court must identify the extent of the multiplicity resulting from the attorney's behavior and the costs arising therefrom"); *see also Sangui Biotech Int'l, Inc. v. Kappes*, 179 F.Supp. 2d 1240, 1243 (D. Colo. 2002).  Both requirements are met here.

After the Court issued its claim construction rulings, Medtronic's counsel proceeded cavalierly, with reckless indifference to the merits of Medtronic's infringement claims.  The continued prosecution of a claim after its lack of merit has become apparent warrants sanctions under § 1927.  *Shackelford*, 96 F.Supp. 2d at 1145.  At trial, MWE's conduct was in disregard for the duty of candor, reflecting an attitude of "what can I get away with?"  Throughout the trial, the MWE lawyers artfully

-19-

avoided the limitations of the patent claims and created an illusion of infringement.

They did so with full awareness that their case was without merit.

There is a split of authority on the question of whether section 1927 authorizes

fee awards against law firms. *See Claiborne v. Wisdom*, 414 F.3d 715, 722-24 (7th Cir.

2005) (discussing circuit split and concluding that "§ 1927 does not provide a legal

basis for an order of fees against an entity like a law firm that is not itself 'admitted to

practice'"). The United States Court of Appeals for the Tenth Circuit has not addressed

this issue. In this case, an award against the firm is appropriate. As the lead lawyers,

Mr. McMahon and Ms. Elson were the most visible, but numerous MWE lawyers and

support staff participated in the litigation and in the trial. Liability should be borne by

the firm. If section 1927 does not support an award of fees against MWE as an entity,

then such an award is appropriate under the court's inherent authority.

*An fee award is appropriate under the Court's inherent authority*

Federal courts have inherent authority to "assess attorney's fees when a party

has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v.*

*NASCO*, 501 U.S. 32, 50 (1991) (quoting *Alyeska Pipeline Service Co. v. Wilderness*

*Society*, 421 U.S. 240, 258-59 (1975)). This authority includes the authority to assess

fees against counsel who engage in abusive litigation conduct. To impose an award of

attorney's fees against counsel under the court's inherent powers, the court must find

that the counsel's conduct constituted or was tantamount to bad faith. *Roadway*

*Express, Inc. v. Piper*, 447 U.S. 752, 766-67 (1980).

The facts discussed above support an award of fees under the court's inherent authority.  Medtronic's and MWE's pursuit of meritless litigation to eliminate competition in the medical products market requires remediation.

Based on the foregoing, it is

ORDERED that the order staying any proceeding on defendants' bill of costs [doc. 559] is vacated.  The defendants' motion for costs [doc. 552] will be determined initially by the Clerk of the Court; it is

FURTHER ORDERED that the defendants' motion for attorney fees [doc. 553] is granted in part.  On or before March 12, 2008, the defendants shall file a detailed description of the services rendered by their attorneys in connection with the district court proceedings in this suit from February 24, 2005, through the date of this order, with accompanying affidavits and summaries of the relevant qualifications and experience as required by Local Rule 54.3.  Objections to the requested fees may be filed on or before April 11, 2008.

Dated:  February 12, 2008

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge